# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Android cellular device<br>Seizure No. 2023250100059201-0005<br>("Target Device") | )<br>)<br>)  Case No.   **23mj3579-MSB**<br>)<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the    Southern    District of    California   , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 841, 843, 846 | Possession with Intent to Distribute; Use of a Communication Facility; and Conspiracy to Distribute |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Robert H. Resico, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by   telephone   *(specify reliable electronic means)*.

Date:  September 29, 2023

*Judge's signature*

City and state:  San Diego, California         Hon. Michael S. Berg, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Special Agent Robert H. Resico, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device:

>Black Android cellular device
>Seizure No. 2023250100059201-0005
>Found in the possession of Leonard John TRI
>("**Target Device**")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, 841(a)(1), 843(b), and 846 ("Target Offenses") as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Leonard John TRI ("TRI") for knowingly and intentionally possessing, with intent to distribute, more than forty (40) grams of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (commonly known as fentanyl), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Sections Section 841(a)(1) and (b)(1)(B)(vi). The Target Device is currently in the custody of Homeland Security Investigations (HSI) and located at 2055 Sanyo Avenue, Suite 120, San Diego, California 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since November of 2019. I am currently assigned to the HSI Office

of the Deputy Special Agent in Charge, in San Ysidro, California.

4. Since April 2023, I have been assigned to the San Diego Fentanyl Abatement & Suppression Team (FAST). FAST is a multi-agency task force focused on stopping the spread of fentanyl in San Diego County and lowering overdose rates. FAST is designed to provide support to state and local agencies seeking to address the problem of fentanyl distribution in the County, and to target fentanyl distributors causing overdoses and deaths.

5. During my tenure with HSI and through my experience on FAST, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and throughout the Southern District of California. Through my training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers.

6. I graduated from the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia in 2020. At FLETC, my training included a wide range of subject areas such as narcotics trafficking, money laundering and firearms trafficking, among others. Since graduating, I have participated in and conducted investigations of violations of various state and federal criminal laws, including possession with intent to distribute controlled substances, distribution of controlled substances, use of communication facilities to commit narcotics offenses, importation of controlled substances, and conspiracy to import, possess and distribute controlled substances. These investigations resulted in arrests of individuals who imported, smuggled, received, and distributed controlled substances, including cocaine, heroin, methamphetamine, and marijuana. These investigations also resulted in arrests of individuals involved in smuggling bulk U.S. currency from the United States to Mexico and from Mexico into the United States. Through these investigations, my experience, and training, as well as discussing the methods and practices of narcotics traffickers and money launderers with numerous law enforcement officers and confidential sources, I have become familiar with the operations of drug trafficking and money laundering organizations in the United States and Mexico.

During these investigations, I have participated in undercover and confidential source buy operations, telephone toll analysis, records research, and physical and electronic surveillance activities. I have also participated in debriefings of many individuals who were arrested and later cooperated with law enforcement. Lastly, I have been involved in numerous investigations in which court authorized wire or electronic interceptions were utilized to further the investigation. My involvement has included assisting with surveillance, monitoring intercepted communications, and preparing reports of my observations.

7. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in narcotics trafficking investigations, I am aware that individuals engaged in drug trafficking commonly store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in drug trafficking, as well as images and videos of drugs or contraband, proceeds and assets from drug trafficking, and communications to and from recruiters and organizers.

8. I am also aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones to import and/or distribute narcotics. For example, common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the

individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States. With respect to the distribution of narcotics, I am aware that narcotics traffickers frequently communicate with co-conspirators concerning distribution events. These communications can occur before, during and after the narcotics distribution event. For example, prior to a sale of narcotics, narcotics traffickers frequently communicate with their buyers, suppliers, and other co-conspirators regarding arrangements and preparation for the narcotics sale. When the sale is underway, narcotics traffickers frequently communicate with co-conspirators to warn accomplices about law enforcement activity.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

a. tending to identify attempts to import and/or distribute controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

b. tending to identify the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offense

c. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

d. tending to identify co-conspirators, criminal associates, or others involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses; to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify travel to or presence at locations involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses; such as stash houses, load houses, or delivery points;

f. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

g. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above, which are evidence of the **Target Offenses**.

//
//

**FACTS SUPPORTING PROBABLE CAUSE**
**Overdose Investigation and Subsequent Controlled Purchase of one gram of Fentanyl**

10. On August 23, 2023, at approximately 9:49 a.m., Carlsbad Police Department (CBPD) received a call reporting a male passed out behind the wheel of a vehicle at the 7-11 located at 901 Palomar Airport Road in Carlsbad, California 92011, within the Southern District of California. CBPD officers responded to the location and found a male, later identified as E.P., deceased behind the wheel of the vehicle. An overdose investigation was initiated after a small quantity of a white substance and tin foil were found in the center console of the vehicle. The white substance tested presumptively positive for fentanyl. E.P.'s phone was also found in the vehicle.

11. E.P.'s next of kin gave consent to search the phone. A CBPD detective found text messages between E.P. and an unknown individual that took place on August 21, 2023, in which E.P. and the unknown individual discussed the sale of "fetty," slang for fentanyl. Based on the lack of communication or information located on the phone that pertained to narcotics in the days leading to E.P.'s death, detectives believed that the unknown person who communicated with E.P. on August 21st may have sold the fentanyl discovered in E.P.'s vehicle on August 23rd. A subsequent search of opensource databases revealed that the phone number E.P. was communicating with was associated with Leonard John TRI (TRI). Detectives also identified a vehicle registered to TRI and using the license plate associated with that vehicle, located the vehicle at the Motel 6 located at 3738 Plaza Dr., Oceanside, California 92056 ("Motel 6").

12. At approximately 3:30 PM, CBPD detectives, using E.P.'s phone and pretending to be E.P., messaged the suspected seller's number and planned to meet the suspected seller to purchase one gram of fentanyl. Around this time, CBPD officers located TRI at the Motel 6. CBPD detectives contacted a hotel employee who confirmed TRI was a registered guest.

13. CBPD officers observed TRI departing Motel 6 in a Jeep Grand Cherokee,

bearing California license plate 8XFA422 ("the vehicle").  Surveillance was maintained on TRI and the vehicle thereafter by CBPD officers.

14. CBPD detectives arranged to meet the suspected seller at 2525 El Camino Real, Carlsbad, California.

15. At approximately 9:30 PM, TRI arrived at or near 2525 El Camino Real, Carlsbad, California and CBPD initiated a traffic stop based on multiple California Vehicle Code violations, including, but not limited to the front windows being tinted.

16. A CBPD narcotics detection canine alerted to several areas on the vehicle, to include the driver side door and center console.  A subsequent search of the vehicle resulted in the discovery of the following items: a scale, a large quantity of unused cellophane baggies (suspected packaging material), 79.2 grams of suspected fentanyl, 7.1 grams of suspected heroin, 2.5 grams of suspected cocaine, and .4 grams of suspected methamphetamine. The suspected fentanyl was field tested and tested presumptive positive for the presence of fentanyl.  A phone was found on the passenger seat where TRI had been sitting.  The decedent's phone was used to call the suspected seller's number, and TRI's phone rang.

17. CBPD detectives executed a state search warrant of TRI's room at the Motel 6. During the search, CBPD located a safe, which contained two non-serialized handguns, known as "Ghost" guns.  One of the non-serialized handguns had a magazine inserted and contained five-rounds of 9mm ammunition; the second firearm had a magazine inserted and contained 17-rounds of 9mm ammunition, and one-round of 9mm ammunition in the chamber.   Detectives also found a stun gun, unused cellophane baggies (suspected packaging material), and a handgun holster inside the hotel room.

18. TRI was arrested and taken to the Carlsbad Police Department. During a post-Miranda interview, TRI said that he was going to the location to go shopping and meet with his friend named "Eric".  TRI claimed ownership of the heroin in the vehicle, but denied knowledge of all the other narcotics and denied involvement in the sale of narcotics.

TRI was transported to the Vista Detention Facility and booked for multiple state charges.

## September 5, 2023, Traffic Stop and Subsequent Arrest

19. After being released on bond following his arrest on August 23, 2023, TRI was arrested on September 5, 2023, after fentanyl and drug paraphernalia were discovered in TRI's vehicle following a traffic stop.

20. On September 5, 2023, at approximately 7:17 p.m., a CBPD officer was on duty in his marked patrol vehicle in a parking lot on Raintree Drive. The officer observed a silver Jeep Grand Cherokee drive out of the parking lot of the Motel 6 and stop at a stop sign. The officer observed that the vehicle's passenger brake light did not function when the brakes were applied. Based on the observed violation of the California Vehicle Code, the officer conducted a traffic stop of TRI's vehicle.

21. TRI was the driver and sole occupant of the vehicle. TRI acknowledged to the CBPD officer that his taillight was not working. The officer issued a warning to TRI for his faulty taillight. TRI asked the CBPD officer if he could exit the vehicle to work on his taillight. The officer told TRI that he had received his warning and, therefore, was free to inspect the taillight. While TRI was outside the vehicle, the officer asked TRI for consent to search the vehicle. TRI gave verbal consent, which was captured on the officer's body worn camera.

22. The officer opened the center console and found narcotics paraphernalia. TRI was detained, and once informed of the discovery, TRI claimed that a friend who had been in possession of the vehicle left the items discovered in the vehicle. TRI said that he went through his vehicle and put all the drug paraphernalia he located in the center console. TRI was subsequently read his Miranda Rights.

23. During a further search of the vehicle, officers found three plastic bags under the carpet near the transmission tunnel on the front passenger's side. The bags contained 1.73 ounces of a white powdery substance. The substance later field tested positive for fentanyl. Packaging material was also discovered inside the passenger side glove compartment. A small scale disguised as a key fob was discovered in a small black bag

behind the driver's side rear passenger seat. A small black box, containing a spoon, needles, and pipe were also discovered in the vehicle, which TRI identified as belonging to him.

24. TRI stated that he is a heroin user and does not use fentanyl. TRI denied knowledge of the narcotics in the vehicle.

25. Based on the fentanyl found in the vehicle, along with the packaging material and scales, TRI was arrested and transported to the Vista Detention Facility where he was booked for multiple state charges related to the distribution of fentanyl.

**FAST Arrest of Leonard TRI on September 26, 2023**

26. On September 26, 2023, a Complaint and warrant for TRI's arrest were signed by Magistrate Judge Michael S. Berg related to the above-described offenses. On the same day, FAST special agents and task force officers (TFOs) attempted to determine TRI's location to execute the arrest warrant by contacting a Facebook account bearing the name "Lenny Tri", which contained pictures that appear to be TRI. A FAST special agent (SA), posing as a narcotics user, contacted the Facebook account and asked to purchase one gram of implied narcotics from TRI. During the conversation, TRI informed the SA he was in the city of Oceanside, California, later specifying that he was at the "Harbor Inn". TRI agreed to sell the SA one gram of narcotics for $60.00 U.S.D in the parking lot of the Chevron gas station located approximately 1/8 of a mile north of the Harbor Inn & Suites on North Coast Highway. FAST agents set up surveillance in the vicinity of the Harbor Inn & Suites in anticipation of the narcotics transaction. TRI was observed by FAST agents walking from the vicinity of room 115 with a white female, later identified as Kellee Kaufmann, prior to getting into a silver Chevrolet sedan bearing California license plate 9CXC543 ("the vehicle"). After the vehicle left the Harbor Inn & Suites, FAST agents continued to monitor the vehicle as it drove North on North Coast Highway.

27. Shortly thereafter, the vehicle was observed by FAST agents arriving at the Chevron gas station, driven by Kaufmann with TRI in the front passenger seat. Once the vehicle was in the Chevron gas station, FAST agents activated their police lights and took

TRI and Kaufmann into custody.

28. While outside the vehicle, FAST agents observed a glass pipe with a bulbous end attached to a cup and in the center console. Law enforcement recognized the pipe as paraphernalia commonly used to consume controlled substances.

29. During a subsequent search of the vehicle, law enforcement found approximately 16.5 gross grams of methamphetamine, which field tested presumptive positive; approximately 24.2 gross grams of powder fentanyl, which field tested presumptive positive; and approximately 2.5 gross grams of suspected black tar heroin in various plastic containers on the front passenger floorboard. Additionally, law enforcement found multiple clear plastic baggies as well and numerous items consistent with drug use paraphernalia.

30. TRI was questioned regarding the hotel room, and he said that he and Kaufmann were staying in room #115. TRI was also in possession of a keycard with the room number. Furthermore, FAST agents checked the registry at the Harbor Inn & Suites and further corroborated that TRI and Kaufman were registered guests in room 115.

31. TRI was arrested, subsequent to a court ordered Arrest Warrant, for violation of Title 21, United States Code, § 841(a)(1), Possession of Fentanyl with Intent to Distribute (Felony).

32. Kaufmann was released after her interview and the completion of a pat down by a female Oceanside Police Department officer.

33. The **Target Device** was seized by a FAST agent who was tasked to perform a secondary inspection of the Vehicle and inventory all the property seized from TRI and the vehicle. The **Target Device** was previously removed by TRI, when he was emptying his pockets, and placed on the hood of the vehicle, , before he was handcuffed for officer safety.

34. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names,

electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Device**. In light of the above facts and my experience and training, there is probable cause to believe that TRI was using the **Target Device** to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics.

35. Based on my training and experience, it is also not unusual for individuals, such as TRI, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the **Target Device** for data beginning on July 23, 2023, up to and including September 26, 2023.

## METHODOLOGY

36. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some

of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

37. Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

38. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

39. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

40. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Device** will yield evidence of TRI's violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

//
//

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Robert H. Resico
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 29th day of September, 2023.

_____
Honorable Michael S. Berg
United States Magistrate Judge

# ATTACHMENT A

## *Property to be Searched*

The following property is to be searched:

> Black Android cellular device
>
> Seizure No. 2023250100059201-0005
>
> Found in the possession of Leonard John TRI
>
> ("Target Device")

which is currently in the possession of Homeland Security Investigations, located at 2055 Sanyo Ave, San Diego, CA 92154.

# ATTACHMENT B

## *Items To Be Seized*

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of July 23, 2023, up to and including September 26, 2023:

a. tending to identify attempts to import and/or distribute controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

b. tending to identify the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offense;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

c. tending to identify co-conspirators, criminal associates, or others involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

d. tending to identify travel to or presence at locations involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United

    States and Mexico and/or conspiracy to commit said offenses; such as stash houses, load houses, or delivery points;

 e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

 f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above

which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846.